IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

AIDA RIVERA ABELLA,

    Plaintiff,

    v.

PUERTO RICO TELEPHONE CO.,
and/or VERIZON WIRELESS,
et al.,

    Defendants.

CIVIL NO. 02-2417 (RLA)

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Codefendants Puerto Rico Telephone Company ("PRTC") and Jorge L. Rentas ("Rentas") have moved the court to enter summary judgment dismissing the federal claims asserted in these proceedings as well as to decline supplemental jurisdiction over the local causes of action pled in the complaint.

The court having carefully considered the memoranda filed by the parties as well as the evidence attached thereto hereby rules as follows.

### BACKGROUND

Plaintiff filed the instant suit against PRTC and Rentas, her former supervisor, alleging that defendants violated the Rehabilitation Act, 29 U.S.C. § 794 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101-12213, by failing to provide her with a reasonable accommodation and by retaliating against her due to her disability. Additionally, plaintiff avers

**CIVIL NO. 02-2417 (RLA)**                                        **Page 2**

---

sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(1) claiming both *quid pro quo* and hostile work environment as well as retaliation. Plaintiff further asserts a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 215(a)(3) and 216 as well as various local provisions.[1]

### SUMMARY JUDGMENT STANDARD

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if

---

[1] Claims were pleaded under Puerto Rico torts, disability, discrimination and sexual harassment statutes.

CIVIL NO. 02-2417 (RLA)                                    **Page 3**

it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Sav. Bank, 54 F. 3d 27, 31 (1st Cir. 1995).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004) (citing Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir.1995)).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *See also*, Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment."); Perez-Trujillo v. Volvo Car Corp., 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting

evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cruz-Baez v. Negron-Irizarry, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202; Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2000); Grant's Dairy v. Comm'r of Maine Dep't of Agric., 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 412 (1st Cir. 2000); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Further, any testimony used in a motion for summary judgment setting must be admissible in evidence, i.e., based on personal knowledge and otherwise not contravening evidentiary principles. Rule 56(e) specifically mandates that affidavits submitted in conjunction with the summary judgment mechanism must "be made on personal knowledge, shall set forth such facts as would be admissible in

evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Hoffman v. Applicators Sales and Serv., Inc., 439 F.3d 9, 16 (1st Cir. 2006); Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000). *See also*, Quiñones v. Buick, 436 F.3d 284, 290  (1st Cir. 2006) (affidavit inadmissible given plaintiff's failure to cite "supporting evidence to which he could testify in court"). The affidavit must contain facts which are admissible in evidence. Lopez-Carrasquillo v. Rubianes, 230 F.3d at 414. "Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

Lastly, motions for summary judgment must comport with the provisions of Local Rule 56(c) which, in pertinent part reads:

A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule.

This provision specifically requires that in its own statement of material facts respondent either admit, deny, or qualify each of movant's proffered uncontested facts and for each denied or qualified

CIVIL NO. 02-2417 (RLA)                                          Page 6

statement cite the specific part of the record which supports its denial or qualification. Respondent must prepare its separate statement much in the same manner as when answering a complaint.

The purpose behind the local rule is to allow the court to examine each of the movant's proposed uncontested facts and ascertain whether or not there is adequate evidence to render it uncontested. *See*, Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 33 (1st Cir. 2001) (summary judgment should not "impose [upon the court] the daunting burden of seeking a needle in a haystack"); *see also*, Leon v. Sanchez-Bermudez, 332 F. Supp.2d 407, 415 (D.P.R. 2004).

Apart from the fact that Rule 56(e) itself provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted" in discussing Local Rule 311.12, its predecessor, the First Circuit Court of Appeals stressed the importance of compliance by stating that the parties who ignore its strictures run the risk of the court deeming the facts presented in the movant's statement of fact admitted. *See*, Cosme-Rosado v. Serrano-Rodríquez, 360 F.3d 42 (1st Cir. 2004) ("uncontested" facts pleaded by movant deemed admitted due to respondent's failure to properly submit statement of contested facts). "[A]bsent such rules, summary judgment practice could too easily become a game of cat-and-mouse, giving rise to the 'specter of district court judges being unfairly sandbagged by unadvertised

**CIVIL NO. 02-2417 (RLA)**                                          **Page 7**

factual issues.'" <u>Ruiz Rivera v. Riley</u>, 209 F.3d 24, 28 (1st Cir. 2000) (citing <u>Stepanischen v. Merchants Despatch Transp. Corp.</u>, 722 F.2d 922, 931 (1st Cir. 1983)).

We must initially address the difficult task confronted by the court in trying to sort out facts from counsel's own personal assumptions in the responses to defendants' dispositive motion. What should have been a straightforward review of the evidence substantiating plaintiff's version of the facts in accordance with the provisions of Local Rule 56(c) turned into a major challenge due to counsel's consistent editorializing, dissertations and generalizations without adequate references to evidence in the objections to defendants' proffered facts.

The Memorandum of Law in Opposition (docket No. 142) fares no better. Plaintiff's attorney begins by rebuking opposing counsel for not having inquired as to the medication prescribed for her client and her ability to fully comprehend the questions posed to her during her deposition. However, no specific reference is made to objectionable answers which the court should disregard nor is there any indication in the deposition transcript of plaintiff's inability to respond and the need to clarify or correct information previously provided. Further, plaintiff did testify at the beginning of each of the two deposition sessions that she was capable of understanding and answering the questions posed by defendants' counsel.

The first 8 pages of the Memorandum consist of a litany of facts devoid of any legal argument. By the same token, the legal standard applicable to the ADA cases is included but without any reference to plaintiff's specific situation followed by a short summary of sexual harassment law and a paragraph alleging gender discrimination in a generalized, conclusory fashion.

Then, at page 35 of the Memorandum plaintiff addresses her discrimination claims, i.e., "hostile environment", "harassment" due to her "disability" and failure to provide a reasonable accommodation together making the court's task even more taxing.

### THE FACTS

The court finds that the following material facts are duly supported by admissible evidence:

1.  In June 1979 plaintiff, Aida Rivera Abella, began working for PRTC as a long distance operator under temporary employment contract.

2.  On September 1, 1979 plaintiff commenced working with PRTC as a permanent employee.

3.  Plaintiff was named a Frameworker I and subsequently promoted to Frameworker II.

4.  In 1991 plaintiff was transferred from the Levittown Main Distribution Frame (MDF) to the Caparra MDF as Frameworker III.

CIVIL NO. 02-2417 (RLA)                                        Page 9

5.    Plaintiff's responsibilities as Frameworker required her to test cables and install telephone lines in the main frame. To perform these functions, she was required to scale and descend a step ladder.

6.    During her tenure at the Caparra MDF, plaintiff reported to the State Insurance Fund ("SIF") on three separate occasions due to ladder-related accidents at work.

7.    On June 30, 1992, plaintiff reported to the SIF after having allegedly fallen from a ladder at work. Plaintiff suffered an ankle sprain and was ordered to return to work under continuing treatment.

8.    On November 8, 1995, plaintiff again reported to the SIF after a ladder had allegedly fallen over her at work. She was treated for Lumbo Sacral Strain, Left Hip Strain and Left Shoulder Strain. Plaintiff was placed on a rest period through December 14, 1995, when she was instructed to return to work under continuing treatment. Plaintiff was eventually discharged by the SIF on July 30, 1996 after having received the maximum treatment benefit afforded.

9.    Again on November 17, 1998, plaintiff reported to the SIF claiming she had fallen from a ladder at work. She was ordered to rest due to a contusion on her right hip, right hand and waist. On May 13, 1999, plaintiff was ordered to return to work under continuing treatment.

CIVIL NO. 02-2417 (RLA)                                    Page 10

10.  As a result thereof, on June 15, 1999, plaintiff requested a reasonable accommodation pursuant to PRTC's Reasonable Accommodation Policy indicating that she could not go up and down a ladder nor squat to work on the low cables. The request was accompanied by a SIF rehabilitations specialist letter confirming a diagnosis of Hip, right hand and Lumbar Contusion and indicating that plaintiff's medical conditions diminished her ability to step up and down ladders, walk for extended periods of time or remain in fixed corporal positions.

11.  Plaintiff specifically requested to be assigned to the MDF dispatch as a reasonable accommodation.

12.  In response to plaintiff's request, PRTC began a process of investigating alternatives to provide plaintiff with a reasonable accommodation for her condition.

13.  According to the investigation, it was determined that there was no permanent position available at the MDF where plaintiff would not have to go up and down a ladder.

14.  Plaintiff was discharged by the SIF on June 28, 1999 with a no disability finding after having exhausted the maximum treatment benefits available to her.

15.  Based on the SIF recommendations as well as the physical demands of her position, the EEO Office temporarily assigned plaintiff to work at the MDF dispatch in June 1999

where she did not have to step up and down ladders and performed only clerical work.

16. Plaintiff remained at the dispatch position for approximately one year, through June 2000.

17. Plaintiff never complained to the EEO Office regarding the terms of the aforementioned reasonable accommodation afforded to her.

18. On March 29, 2000, while still assigned to her temporary duties at the MDF dispatch, plaintiff met with Haydee Andino, from the PRTC's Equal Employment Opportunity Office, who offered plaintiff alternate regular positions at either the Information or Repairs Department.

19. Plaintiff declined these options because they were far from her residence and would entail driving through heavy traffic and also because the UIET President ("Unión Independiente de Empleados Telefónicos") had offered her a transfer to the Levittown MDF, a smaller office which was closer to her home.

20. The UIET President informed plaintiff that the transfer to Levittown MDF was conditioned upon being able to perform the duties of the Frameworker III position which required a medical certificate to that effect.

CIVIL NO. 02-2417 (RLA)                                          Page 12

21.  Plaintiff submitted a medical certificate dated April 6, 2000, to PRTC, indicating that she was "able to perform any type of work, same as before her disability."

22.  As a result thereof, plaintiff's reasonable accommodation with her employer ceased.

23.  Thereafter, plaintiff did not again express an interest in a reasonable accommodation for any disability.

24.  On June 21, 2000, plaintiff reported to the SIF. According to plaintiff's SIF declaration, her emotional condition was caused by the pressure and labor harassment received from Rentas at work. She also complained of pain in her neck, shoulder, back and numbness in her arms and legs. The PRTC Employer Report, on the other hand, indicated that plaintiff had suffered a nervous crisis after having a disagreement with her supervisor.

25.  Plaintiff never again saw or had contact with Rentas after June 21, 2000, the day when she ceased working at the Caparra MDF and reported to the SIF.

26.  According to plaintiff, the first alleged incident of sexual harassment occurred at the end of 1998 beginning of 1999 and the last incident occurred in June 2000, when she ceased working at the Caparra MDF.

27.  On July 13, 2000, the SIF initially determined that plaintiff could return to work while receiving treatment

but this finding was subsequently changed on July 20, 2000, when she was ordered to rest.

28. On September 19, 2000, while still at rest away from work, plaintiff signed a stipulation agreement whereby she was transferred to the Levittown MDF.

29. On October 30, 2000, the SIF ordered plaintiff back to work with continuing treatment.

30. In October 2000 plaintiff returned to work with PRTC ,this time at the Levittown MDF.

31. Santos Diaz was plaintiff's supervisor while she worked at the Levittown MDF. Mr. Diaz granted plaintiff yet another accommodation by allowing her to work at two small central offices where there were less orders to put through and no need to go up and down step ladders.

32. On April 3, 2001, plaintiff filed an administrative charge with the Puerto Rico Department of Labor Anti-Discrimination Unit ("ADU") alleging that she had been subject to harassment and discrimination on the basis of disability and sex since 1999. Plaintiff subsequently amended her charge on September 17, 2001, to include a retaliation claim.

33. Plaintiff fled an application for Disability Insurance Benefits with the Social Security Administration on March

CIVIL NO. 02-2417 (RLA)                                          Page 14

11, 2002. The final determination denying the request for benefits was rendered on September 5, 2003.

**ADA**

Plaintiff claims that due to a lumbar, hand and hip concussion she needed an accommodation in her job as Frameworker III.

Defendants contend that: (1) plaintiff is not a qualified individual under the ADA; (2) the accommodation sought by her was unreasonable; (3) defendants complied with any obligation to provide her with a reasonable accommodation; (4) plaintiff was responsible for the breakdown of the accommodation granted her inasmuch as she rejected alternate permanent positions offered her and in turn, presented a medical certificate vouching for her ability to perform any type of work prior to her disability and (5) plaintiff failed to exhaust her administrative remedies regarding her retaliation claim and the same is time-barred. In the alternative, plaintiff did not engage in a protected activity under the statute and there is no evidence that she suffered any tangible and/or adverse employment action.

The ADA prescribes that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to... discharge of employees... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

CIVIL NO. 02-2417 (RLA)                                              Page 15

In cases where a plaintiff alleges that an adverse employment action was taken due to a disability, the "burden-shifting framework outlined by the Supreme Court in Mc-Donnell-Douglas" is used. Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005). Accordingly, in order to qualify for the ADA's protection, plaintiff has the initial burden of establishing that: (1) she suffers from a "disability" within the meaning of the ADA; (2) she was able to perform the essential functions of her position with or without reasonable accommodation; and (3) the employer's adverse employment actions were based in whole or in part on her disability. Mulloy v. Acushnet Co., 460 F.3d 141, 145-46 (1st Cir. 2006); Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 111 (1st Cir. 2006); Wright v. CompUsa, Inc., 352 F.3d 472, 475 (1st Cir. 2003); Tobin, 433 F.3d at 104; Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166 (1st Cir. 2002); Carroll v. Xerox Corp., 294 F.3d 231, 238 (1st Cir. 2002); Guillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 18 (1st Cir. 2002); Quinn v. A.E. Staley Mfg. Co., 172 F.3d 1, 9 n.3 (1st Cir. 1999); Tardie v. Rehab. Hosp. of Rhode Island, 168 F.3d 538, 541 (1st Cir. 1999).

The term "discriminate" under the ADA also includes the employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability". 42 U.S.C. § 12112(b)(5)(A).

A failure-to-accommodate claim has a different set of requirements, all of which must be met if plaintiff is to survive a motion for summary judgment. The First Circuit Court of Appeals has listed these as: (a) plaintiff must furnish sufficient admissible evidence that she is a qualified individual with a disability within the meaning of the ADA; (b) that she worked for an employer covered by the ADA; (c) that the employer, despite its knowledge of the employee's physical limitations, did not accommodate those limitations; (d) that the employer's failure to accommodate the known physical limitations affected the terms, conditions, or privileges of the plaintiff's employment. Orta-Castro, 447 F.3d at 112; Tobin, 433 F.3d at 107; Higgins v. New Balance Athletic Shoe, 194 F.3d 252, 264 (1st Cir. 1999). See also, Feliciano-Hill v. Principi, 439 F.3d 18, 26 (1st Cir. 2006) (same elements under the Rehabilitation Act).

### Disability

Whether plaintiff seeks relief based on employment discriminatory practices or a failure to accommodate plaintiff must first meet the requirement of a "disability" under the ADA.

The term "disability" as defined in the statute is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Hence, plaintiff's initial step in establishing a disability claim under the ADA is to present evidence of a physical or mental

impairment. Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 194, 122 S.Ct. 681, 691, 151 L.Ed.2d 615, 629 (2002).

In making our determination under the ADA, the particular circumstances attendant to plaintiff's condition must be examined. "[T]he existence of a disability [must] be determined in ... a case-by-case manner." Toyota, 534 U.S. at 198, 122 S.Ct. at 691, 151 L.Ed2d at 631; Wright, 352 F.3d at 476 n.1. "Whether a person has a disability under the ADA is an 'individualized inquiry.'" Bailey, 306 F.3d at 1167 (citing Sutton v. United Air Lines, Inc., 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)); Carroll, 294 F.3d at 238.

However, having an impairment in and of itself is not sufficient to be entitled to ADA's protection. It is imperative that the impairment also have a substantial effect on a major life activity. Toyota, 534 U.S. at 195, 122 S.Ct. at 690, 151 L.Ed.2d at 629; Sullivan v. Neiman Marcus Gp., Inc., 358 F.3d 110, 115 (1st Cir. 2004); Whitlock v. Mac-Gray, Inc., 345 F.3d 44, 46 (1st Cir. 2003); Bailey, 306 F.3d at 1167; Carroll, 294 F.3d at 238.

Hence, evidence of an impairment supported only by a medical diagnosis is inadequate to prove a disability within the provisions of the ADA. "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." Toyota, 534 U.S. at 198, 122 S.Ct. at 691, 151 L.Ed.2d at 631; Wright, 352 F.3d at 476-77;

Whitlock, 345 F.3d at 46; Calef v. Gillette Co., 322 F.3d 75, 83 (1st Cir. 2003); Bailey, 306 F.3d at 1167.

In this regard, a physician's "conclusory assertion of total disability - an assertion lacking elaboration and support in the record - [is not] sufficient to make the individualized showing of [plaintiff's] particular limitations". Whitlock, 345 F.3d at 46. *See also*, Gonzalez v. El Dia, Inc., 304 F.3d 63, 74 (1st Cir. 2002) ("testimony presented by the treating physician [was] highly conclusory.")

"Instead, the ADA requires [that claimants submit]... evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." Toyota, 534 U.S. at 198, 122 S.Ct. at 691, 151 L.Ed.2d at 632 (citation and internal marks omitted.) That is, "[a]n ADA plaintiff must offer evidence demonstrating that the limitation caused by the impairment is substantial in terms of his or her own experience." Bailey, 306 F.3d at 1167.

The ADA does not define the term "substantially limits." The Supreme Court has stated that "'substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree'." Toyota, 534 U.S. at 196, 122 S.Ct. at 690, 151 L.Ed.2d at 630. "A substantial limitation cannot include any impairment which interferes in only a minor way with the performance of manual tasks, and the phrase 'major life activities' refers to only those

CIVIL NO. 02-2417 (RLA)                                    Page 19

activities which are of central importance to daily life." Benoit v. Technical Mfg. Co., 331 F.3d 166, 176 (1st Cir. 2003) (citations and internal quotation marks omitted).

On the other hand, "'[m]ajor' in the phrase 'major life activities' means important... 'Major life activities' thus refers to those activities that are of central importance to daily life." Toyota, 534 U.S. at 198, 122 S.Ct. at 691, 151 L.Ed.2d at 631; Bailey, 306 F.3d at 1167. See also, Benoit, 331 F.3d 176 (if no major life activity is affected the impairment is not considered a "disability" under ADA); Guzman-Rosario v. United Parcel Service, Inc., 397 F.3d 6, 10 (1st Cir. 2005) (whether plaintiff's "condition impinged sufficiently on a 'major life activity' to be treated as disabling."

Temporary conditions are not covered by ADA. "The impairment's impact must also be permanent or long term." Toyota, 534 U.S. at 198, 122 S.Ct. at 691, 151 L.Ed. 2d at 631; Guzman-Rosario, 397 F.3d at 10; Sullivan, 358 F.3d at 116; Benoit, 331 F.3d at 176; Carroll, 294 F.3d at 238.

We find no evidence in the record showing that plaintiff specifically identified the major life activities that were being purportedly limited by her conditions, either at the time she requested accommodation or prior to leaving the Caparra MDF facilities in June 2001. In her opposition to the summary judgment motion, plaintiff does not identify the nature of her disability

under the ADA but rather argues, in a conclusory fashion, that she is a "qualified individual with a disability within the meaning of the Act."[2]

Plaintiff cursorily states that her "lumbar, hand and hip concussions needed and still need a reasonable accommodation".[3] We assume the basis for this argument is the June 2, 1999 opinion of a SIF Rehabilitation Specialist who concluded that plaintiff's diagnosis of hip concussion, right hand and lumbar concussion [sic][4] reduced her ability and tolerance for going up and down the stairs, walk for prolonged periods of time and assume fixed physical postures.[5]

However, these recommendations do not meet the definition of substantial limitation set forth in the regulations, which require that plaintiff either be "[u]nable to perform a major life activity that the average person in the general population can perform; or ... [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the condition, manner or duration under which the average

---

[2]   Memorandum of Law in Opposition (docket No. 143) p. 36.

[3]   Memorandum of Law in Opposition (docket No. 143) p. 35.

[4]   Correct translation should be "contusion".

[5]   Defendants' Motion for Summary Judgment (docket No. 142) Exh. 33).

CIVIL NO. 02-2417 (RLA)                                      **Page 21**

person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1) (2006).

Plaintiff has not argued that either walking up and down a step ladder or assuming a fixed physical posture constitute major life activities within the purview of the ADA. Additionally, there is no reference in the report as to how long plaintiff could walk nor how her limitation compared to the walking tolerance of the average population.

We further note that references to the determination of the Social Security Administration denying her March 11, 2002 application for disability benefits are also unavailing.[6] Plaintiff's ADA claim must be based on the evidence available to the employer at the relevant period of time which, as previously noted, only made reference to plaintiff's hip, hand and lumbar condition.

Based on the foregoing, we conclude that plaintiff has failed to adduce sufficient evidence to establish that she had an ADA-covered disability, which in turn, would trigger the protection afforded by this statute.

### Essential Functions of Position

Even assuming that plaintiff would have been able to overcome this first statutory hurdle, her ADA claim would still fail.

It should be noted that, depending on the circumstances, reasonable accommodation cases may be initially approached from the

---

[6]  This petition was denied on September 5, 2003.

individual's ability to carry out the essential functions of his/her position. *See, i.e.*, Mulloy, 460 F.3d at 148 ("Before we proceed further with the analysis of [plaintiff's] claim that [defendant] should have allowed him to work at a remote location, we must decide whether the ADA requires us to evaluate this claim as an essential function issue or as a reasonable accommodation issue.")

As part of her burden, plaintiff must also establish that she was capable of performing the essential functions of her job either with or without accommodation. "It is plaintiff's burden to prove that, at the time she sought [accommodation] she had the ability to perform the essential functions of [her position]." Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 18 (1st Cir. 1998). "'In order to be a 'qualified individual' under the Act, the burden is on the employee to show: first, that she possesses the requisite skill, experience, education and other job-related requirements of the position, and second, that she is able to perform the essential functions of the position with or without reasonable accommodation.'" Mulloy, 460 F.3d at 147 (1st Cir. 2006) (citing Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 (1st Cir. 2000)); Soto-Ocasio, 150 F.3d at 18; *see also*, 29 C.F.R. § 1630.2(m).

"An 'essential function' is a fundamental job duty of the position at issue [but] does not include the marginal functions of the position." Mulloy, 460 F.3d at 147 (internal citations and quotation marks omitted); 29 C.F.R. § 1630.2(n)(1).

The regulations further provide that the factors to be considered in ascertaining whether a particular job function is essential include: "[t]he employer's judgment as to which functions are essential... [w]ritten job descriptions... [t]he amount of time spent on the job performing the function... [t]he consequences of not requiring the incumbent to perform the function... [t]he work experience of past incumbents in the job; and/or [t]he current work experience of incumbents in similar jobs." 29 C.F.R. 1630.2(n)(3). *See also*, Mulloy, 460 F.3d at 147.

Additionally, the court must also defer to the position requirements established by the employer. "In the absence of evidence of discriminatory animus, we generally give substantial weight to the employer's view of job requirements. In other words, our inquiry into essential functions is not intended to second guess the employer or to require the employer to lower company standards." Mulloy, 460 F.3d at 147 (citations and internal quotation marks omitted). *See*, Mason v. Avaya Commc'n, 357 F.3d. 1114, 1122 (10th Cir. 2004) ("[court] reluctant to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience.")

In order to prevail in her ADA claim in this action plaintiff must establish that she was able to perform the essential functions of her position as a Frameworker III with or without a reasonable accommodation. According to the corresponding job description and as

CIVIL NO. 02-2417 (RLA)                                    **Page 24**

admitted by plaintiff in her deposition, her principal duties were to: (1) connect and disconnect cables and telephone lines, and (2) provide service to repairers (slicers) in order to change "pares". In order to carry out these functions plaintiff had to go up and down a step ladder. Thus, being able to step up and down a ladder was fundamental to the position of Frameworker and not merely a minor responsibility of her job. Plaintiff also admitted that this part of her job entailed from half to three-quarters of her daily routine.

Based on the foregoing, because plaintiff was unable to carry out essential functions of her job[7] with or without reasonable accommodation we conclude that she was not a "qualified" individual with a disability within the meaning of the ADA.

### Accommodation

Even assuming that plaintiff would have been able to establish that she was a "qualified" individual with a disability which warranted a reasonable accommodation under ADA she would not be able to prevail in this particular claim.

"Reasonable accommodation" includes "[m]odifications or adjustments... to the manner or circumstances under which the position... is customarily performed, that enable a qualified individual with a disability to perform the essential functions of

---

[7]   Plaintiff conceded as much and noted that "she was able to perform the duties of her job **except** for climbing and descending stairs." Memorandum of Law in Opposition (docket No. 143) p. 36. (Emphasis ours).

that position". 29 C.F.R. § 1630.2(o)(1)(ii). "A 'reasonable accommodation' is one which would enable the plaintiff to perform the essential functions of her job and at least on the face of things is feasible for the employer under the circumstances." Mulloy, 460 F.3d at 148 (citation and internal quotation marks omitted).

An employer is not required to provide a reasonable accommodation if it would entail "an undue hardship" on its business operation. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.2(p).

As indicated by the court in Mulloy, suggested accommodations which do away with an essential job function are not reasonable. Rather than an accommodation, these would entail redefining the position or creating a new position. "It is well established that, while a reasonable accommodation may include job restructuring, 42 U.S.C. § 12111(9)(B), the law does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous." Mulloy, 460 F.3d at 153 (internal citation and quotation marks omitted); Soto-Ocasio, 150 F.3d at 20; Phelps v. Optima Health, Inc., 251 F.3d 21, 26 (1st Cir. 2001).

In light of her essential job requirements, plaintiff's request to be excused from having to climb and descend a ladder and that she be limited to clerical tasks was not a reasonable accommodation within the context of the ADA.

However, even though plaintiff was not a qualified individual for purposes of the ADA, the facts in this case also establish that she was provided with a reasonable accommodation by her employer.

"[D]etermining an appropriate reasonable accommodation may require an employer 'to initiate an informal, interactive process' with the individual seeking accommodation." Soto-Ocasio, 150 F.3d at 19 (citing 29 C.F.R. § 1630.2(o)(3)). *See also*, Phelps, 251 F.3d at 27.

It is undisputed that defendant initially responded to plaintiff's request and that based on the recommendation of the SIF's Rehabilitation Specialist, temporarily assigned her to a clerical position at the Caparra MDF from June 1999 through June 2000 while it searched for a permanent reasonable accommodation. Throughout this period of time plaintiff was relieved from having to step up and down ladders and was limited to clerical work.

PRTC continued in its search for viable alternatives to plaintiff's condition. However, there were no permanent positions at the MDF which did not require going up and down a step ladder.

Faced with plaintiff's inability to perform essential job duties of her position, on March 15, 2000, Haydee Andino, a PRTC EEO Office employee, met with plaintiff and offered her regular desk positions at either the Information or Repairs Department. Plaintiff declined both offers alleging they were far away from her residence and would entail driving through heavy traffic. At the time plaintiff indicated

CIVIL NO. 02-2417 (RLA)                                              Page 27

that she was interested in a frame position at the Levittown MDF instead which job she had requested through the UIET president.

On June 8, 2000 plaintiff submitted a medical certificate attesting to her ability to carry out "any type of work, same as before her disability". Faced with this evidence, plaintiff's temporary accommodation was terminated.

In sum, the uncontested evidence clearly establishes that defendant promptly granted plaintiff an accommodation even though she might not have been entitled to it; continued in its search for viable alternatives which plaintiff declined and that the accommodation provided only ceased after plaintiff submitted a medical certificate indicating that she was fit to perform all functions of the Frameworker III position.

Thus, the only accommodation requested by plaintiff during her employment was granted by PRTC and it was discontinued only because plaintiff submitted medical evidence disclaiming any physical limitations.[8]

---

[8]   In her deposition plaintiff acknowledged that she did not request a reasonable accommodation after having submitted a medical certificate in June 2000 vouching for her unrestricted ability to carry out her job as Frameworker III nor did she ever request an accommodation after her transfer to the Bayamon MDF. Further, once transferred to Bayamon, her supervisor, Santos Diaz, provided plaintiff with a reasonable accommodation by allowing her to work at the two small central offices which were less demanding in terms of having to go up and down the ladder.  Defendant's Motion for Summary Judgment (docket No. 142) Exh. 1 p. 113; Exh. 2 p. 57.

**CIVIL NO. 02-2417 (RLA)**                                    **Page 28**

Plaintiff also suggests that PRTC had a duty to provide her with an accommodation even absent a request on her part because her employer was purportedly aware of her physical and mental limitations pursuant to the SIF treatment record. This argument merits no further discussion except to note that a request for accommodation is required to activate the employer's obligation to provide one. *See, i.e.*, Reed v. LePage Bakeries, Inc., 244 F.3d 254, 260 (1st Cir. 2001) ("We need not concern ourselves with the reasonableness of [plaintiff's] accommodation, however, because [she] has failed to prove another essential element of her burden: that she ever sufficiently requested the accommodation in question. This is the fatal flaw in [plaintiff']s case."); Kiman v. New Hampshire Dept. of Corrections, 451 F.3d 274, 283 (1st Cir. 2006) (request needed to trigger reasonable accommodation duty).

Accordingly, plaintiff has no actionable failure to accommodate claim under the ADA.

**ADA Retaliation**

ADA incorporated the exhaustion requirements applicable to Title VII discrimination suits. Thus, "a claimant who seeks to recover for an asserted violation of Title I of the ADA, like one who seeks to recover for an asserted violation of Title VII, must first exhaust administrative remedies by filing a charge with the EEOC, or alternatively, with an appropriate state or local agency, within the prescribed time limits... This omission, if unexcused, bars the

courthouse door, as courts long have recognized that Title VII's charge-filing requirement is a prerequisite to the commencement of suit." Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st 1999).

Prior to resorting to the courts for relief, plaintiffs must present their discrimination claims under Title VII to the appropriate agency. "In light of the statutory scheme, it is unsurprising that, in a Title VII case, a plaintiff's unexcused failure to exhaust administrative remedies effectively bars the courthouse door." Jorge v. Rumsfeld, 404 F.3d 556, 564 (1st Cir. 2005). "In order to prosecute a [Title VII] claim... an aggrieved party must first file a timely administrative complaint." Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005). "[P]laintiffs [may] not proceed under Title VII without first exhausting administrative remedies." Lebron-Rios v. U.S. Marshal Service, 341 F.3d 7, 13 (1st Cir. 2003); Bonilla, 194 F.3d at 275. "Title VII requires that an aggrieved individual exhaust his or her administrative remedies as a prerequisite to filing suit in federal court." Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003). "Title VII requires, as a predicate to a civil action, that the complainant first file an administrative charge with the EEOC within a specified and relatively short time period (usually 180 or 300 days) after the discrimination complained of". Clockedile v. New Hampshire Dept. of Corrections, 245 F.3d 1, 3 (1st Cir. 2001).

CIVIL NO. 02-2417 (RLA)                                          **Page 30**

---

The purpose behind the exhaustion requirement is to give the employer timely notice of the events as well as provide an opportunity for an early amicable resolution of the controversy. "That purpose would be frustrated... if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action." Lattimore v. Polaroid Corp., 99 F.3d 454, 464 (1st Cir. 1996).

In Puerto Rico, an aggrieved employee has 300 days from the occurrence of the employment action complained of to file an administrative charge in instances where the local Department of Labor is empowered to provide relief, i.e., in instances of "deferral" jurisdiction. Bonilla, 194 F.3d at 278 n.4; Lebron-Rios, 341 F.3d 7, 11 n.5 (1st Cir. 2003). Otherwise, the applicable period is 180 days. See, 42 U.S.C. § 2000e-5(e)(1).[9]

---

[9]   In pertinent part, § 2000e-5(e)(1) reads:

> A charge under this section shall be filed within **one hundred and eighty days** after the alleged unlawful employment practice occurred... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto... such charge shall be filed by or on behalf of the person aggrieved within **three hundred days** after the alleged unlawful employment practice occurred.

(Emphasis ours).

CIVIL NO. 02-2417 (RLA)                                    Page 31

---

The Anti-Discrimination Unit of the Puerto Rico Department of Labor has no jurisdiction over Title VII retaliation claims[10] and thus, is not deemed a Designated Agency under § 2000e-5(e)(1). Therefore, claims for retaliation must be filed with the EEOC within 180 days from the events complained of.

Plaintiff filed an ADU charge on April 3, 2001, alleging sexual harassment and discrimination on the basis of sex and disability. No reference is made in the document to disability-based retaliation on the part of the defendants. On September 17, 2001, plaintiff amended her ADU charge to also include a retaliation claim.

During her deposition, plaintiff testified that the alleged retaliatory conduct ended when she ceased working at the Caparra MDF on June 21, 2000, that is, approximately nine months prior to her amended charge identifying retaliation for the first time. Thus, it is axiomatic that at the time plaintiff initially instituted her administrative claim she was well aware of any ADA-related retaliatory conduct but yet failed to include it in her original administrative charge.

---

[10]   The designation of Puerto Rico as a "deferral" state for Title VII violations specifically excludes retaliation claims asserted under Sec. 704(a), 42 U.S.C. § 2000e-3(a). *See*, 29 C.F.R. § 1601.74.

CIVIL NO. 02-2417 (RLA)                                         **Page 32**

Accordingly, we find the disability-based retaliation claim made in September 2001, well beyond the 180 days required period had concluded, was untimely made.[11]

## REHABILITATION ACT

We find there is no viable claim under the Rehabilitation Act, 29 U.S.C. § 794(a). This particular statute precludes disability discrimination under programs receiving Federal financial assistance, *see* Lesley v. Hee Man Chie, 250 F.3d 47, 53 (1st Cir. 2001) or conducted by federal executive agencies, *see*, Feliciano-Hill, 439 F.3d 1; Quiles-Quiles, 439 F.3d 1 (1st Cir. 2006). Plaintiff has not presented evidence that defendant qualified for protection under this statutory provision.

## TITLE VII

Sex discrimination also encompasses sexual harassment in the work setting. Depending on the circumstances, harassment may turn into a hostile work environment or a *quid pro quo* situation. "Sexual harassment, whether by means of a co-worker's demands for sexual favors as a '*quid pro quo*' or by the employer's creation or tolerance of a hostile and abusive work environment, constitutes discrimination prohibited by Title VII." Gorksi, 290 F.3d at 472.

---

[11] Nor do we find plaintiff's claim falls within the exception carved out in Clockedile, 245 F.3d at 5 whereby the administrative claim for a retaliation claim is waived if it "is reasonably related to and grows out of the discrimination complained of to the agency – e.g, the retaliation is for filing the agency complaint itself."

### Hostile Work Environment

The protection against discrimination in employment based on sex provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) has been expanded to areas beyond strictly "economic" and "tangible discrimination" to situations where "sexual harassment is so severe or pervasive as to alter the condition of the victim's employment and create an abusive working environment." Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662, 675 (1998) (citations, internal quotation marks and brackets omitted); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49, 60 (1986); Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006); Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006); Noviello, 398 F.3d at 92.

Thus, even absent a tangible employment action, an employee may successfully assert a sex discrimination action under Title VII if the degree of the harassment is such that it is deemed to have altered the plaintiff's terms and conditions of employment. Fontanez-Nuñez v. Janssen Ortho LLC, 447 F.3d 50, 56 (1st Cir. 2006).

It is imperative to keep in mind that Title VII protects against discrimination "because of" sex. Therefore, the acts complained of must be motivated by plaintiff's sex. "What *is* essential is proof that the work environment was so hostile or abusive, because of

CIVIL NO. 02-2417 (RLA)                                              Page 34

conduct based on one of the prohibited factors identified in Title VII, that the terms or conditions of the plaintiff's employment were caused to be altered." Gorski  v. New Hampshire Dep't of Corrections, 290 F.3d 466, 472 (1st Cir. 2002).

Ascertaining which particular conduct falls within the "severe or pervasive" realm in order to trigger Title VII protection is no easy task.  "'There is no mathematically precise test to determine whether a plaintiff presented sufficient evidence' that she was subjected to a severely or pervasively hostile work environment." Pomales, 447 F.3d at 83 (citing Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003)) (internal brackets omitted); Gorski, 290 F.3d at 472.

However, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; Pomales, 447 F.3d at 83; Noviello, 398 F.3d at 92.

The court will examine the totality of the circumstances to determine whether the degree of the hostile or abusive environment the employee is subjected to is intense enough to fit within Title VII protection. Faragher, 524 U.S. at 787, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; Pomales, 447 F.3d at 83; Valentin-Almeyda, 447 F.3d at 94; Noviello, 398 F.3d at 92; Lee-Crespo v. Schering-Plough del

CIVIL NO. 02-2417 (RLA)                                          **Page 35**

Caribe, Inc., 354 F.3d 34, 46 (1ˢᵗ Cir. 2003); Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1ˢᵗ Cir. 2003).

> [W]hether the environment is objectively hostile or abusive must be answered by reference to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.

Marrero v. Goya de P.R., Inc., 304 F.3d 7, 18-19 (1ˢᵗ Cir. 2002) (citing Harris, 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302 (internal citations omitted); Valentin-Almeyda, 447 F.3d at 94; Fontanez-Nuñez, 445 F.3d at 56; Noviello, 398 F.3d at 92; Lee-Crespo, 354 F.3d at 46; Che, 342 F.3d at 40; Gorski, 290 F.3d at 472; Conto v. Concord Hosp., Inc., 265 F.3d 79, 82 (1ˢᵗ Cir. 2001); O'Rourke v. City of Providence, 235 F.3d 713, 729 (1ˢᵗ Cir. 2001).

The First Circuit Court of Appeals summarized the elements plaintiff must prove in order to succeed in her hostile work environment claim as set forth by the Supreme Court. These are:

> (1) that she... is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive

CIVIL NO. 02-2417 (RLA)                                    Page 36

work environment; (5) that sexually objectionable conduct
was both objectively and subjectively offensive, such that
a reasonable person would find it hostile or abusive and
the victim in fact did perceive it to be so; and (6) that
some basis for employer liability has been established.
Valentin-Almeyda, 447 F.3d at 94 (citing O'Rourke, 235 F.3d at 728).

"Although offhand remarks and isolated incidents are not enough,
'[e]vidence of sexual remarks, innuendoes, ridicule and intimidation
may be sufficient to support a jury verdict for hostile work
environment.'" Valentin-Almeyda, 447 F.3d at 94 (citing O'Rourke, 235
F.3d at 729); Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271,
121 S.Ct. 1508, 1510, 149 L.Ed.2d 509, 511 (2001) (per curiam)
(ordinarily isolated incidents will not be deemed to have haltered
terms and conditions of employment unless they are extremely
serious).

Usually an isolated sexual advance *per se* does not translate
into an abusive workplace environment. *See i.e.*, Pomales, 447 F.3d at
83 (comment and gesture by supervisor suggesting he wanted to have
sexual relations with plaintiff, albeit crude not sufficient because
it "comprised only a single incident." There was no evidence of the
supervisor having either touched or physically threatened plaintiff)
and also citing cases where the following not deemed sufficiently
severe or pervasive under Title VII: five sexual advances by
supervisor "highly doubtful"; "over a two-week period, a coworker

CIVIL NO. 02-2417 (RLA)                                          **Page 37**

stood behind the plaintiff to create physical contact, surreptitiously looked at the plaintiff's genitals in the restroom and engaged in unwanted touching; "single battery and two offensive remarks over six months."

A hostile work environment may result from "sexual remarks, innuendoes, ridicule and intimidation ... disgusting comments" Goya, 304 F.3d at 19 (citations and internal quotations omitted) "unwelcome sexual advances or demands for sexual favors" Gorski, 290 F.3d at 472 (citations and internal quotations omitted) which are "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." O'Rourke, 235 F.3d at 728 (citations and quotation marks omitted). *See also*, Noviello, 398 F.3d at 84.

Courts must discern between "commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness... and severe or pervasive harassment... [and] [t]he thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Id* at 92. *See also*, Lee-Crespo, 354 F.3d at 37 (supervisor's conduct found "boorish and unprofessional" and plaintiff "subjected to incivility" "but... incidents... not severe or pervasive enough to alter the terms and conditions of [plaintiff's] employment").

In Fontanez-Nuñez, 447 F.3d at 57 the court found that a supervisor's "continued use of objectionable language and vulgar

remarks" in plaintiff's presence which were often directed to employees in the area was not sufficiently severe or pervasive to be actionable. The court further explained that "[w]hile the vulgar language was inappropriate to the workplace and completely unprofessional, mere offensive utterances that did not unreasonably interfere with the employee's work performance do not amount to harassment that in essence altered the terms or conditions of [plaintiff's] employment." *See also*, <u>Gorski</u>, 290 F.3d at 469-70 ("Sporadic use of abusive language does not create a hostile work environment because such conduct is not 'extreme' enough to alter the terms and conditions of employment.")

It is plaintiff's burden to establish the severity and pervasiveness of the harassment sufficient to alter the conditions of her employment. <u>Conto</u>, 265 F.3d at 82. In this particular case plaintiff must also present evidence that the harassment was based on plaintiff's gender. <u>Lee-Crespo</u>, 354 F.3d at 44 n.6.

Because this determination is "fact specific", <u>Conto</u>, 265 F.3d at 81, ordinarily "it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." <u>Goya</u>, 304 F.3d at 19. *See also*, <u>Che</u>, 342 F.3d at 40 ("[a]s a general matter, these are questions best left for the jury"). However, "summary judgment is an appropriate vehicle for

CIVIL NO. 02-2417 (RLA)                                         **Page 39**

---

policing the baseline for hostile environment claims." <u>Pomales</u>, 447

F.3d at 83 (citation, internal quotation marks and brackets omitted).

Additionally, plaintiff must present evidence that the

harassment altered the terms of her work. *See*, *id*. at 84 (nor did

plaintiff "present[]... proof that [her supervisor's] conduct

negatively affected her ability to work"); <u>Lee-Crespo</u>, 354 F.3d at 46

(plaintiff failed to introduce evidence that the acts complained of

constituted "an impediment to [plaintiff's] work performance.")

Plaintiff's arguments in this case do not distinguish between

her multiple discrimination claims which makes it extremely difficult

for the court to sort out the alleged facts according to the

particular cause of action. She intermingles the disability and

sexual discrimination claims with each other and further interjects

the alleged retaliation under each of these. Further, despite her

burden under a summary judgment setting, there are few facts and many

conclusory allegations about frequency and severity and aggravation

of plaintiff's condition regarding her sexual harassment claim.

Having probed the record, the following summarizes the evidence

alleged by plaintiff as suggestive of a hostile environment claim by

reason of her sex.

    1.   Rentas use of obscene language and jokes of a sexual
        nature.

The court finds these allegations inapposite to this claim. The

jokes were made in front of all the employees and not specifically

addressed to plaintiff. Further, plaintiff could not specify the language complained of.

2.   Rentas reading a pornographic magazine.

Plaintiff claims that once she walked into Rentas' office and he was looking at a pornographic magazine. However, according to plaintiff, as soon as he noticed her, Rentas closed the magazine and placed it in a drawer. Thus, no improper discriminatory motive may be ascribed to this incident.

3.   Rentas staring at plaintiff while she worked.

Plaintiff alleged that Rentas would stare at her through a hole in the distribution frame while she worked at her desk. However, she was not certain that there was any sexual discriminatory motivation behind this practice.

4.   Rentas grazed her legs and put his buttocks near her face.

According to plaintiff, on one occasion, while she was connecting cables on a step ladder Rentas climbed on the same ladder and grazed her legs. However, this was a one-time incident and it was purportedly because Rentas wanted to verify some work.

Additionally, plaintiff alleges that on various occasions, when plaintiff was talking to coworkers, Rentas would stand in between them. As explained by plaintiff, because of the fact that she was sitting down and the limited space between her and the other employee, Rentas' buttocks or genitals would end up near her face or the face of the coworker.

CIVIL NO. 02-2417 (RLA)                                          **Page 41**

Plaintiff admitted that this would only happen when she was speaking with a co-worker and because Rentas considered that she spoke too much instead of working. Again, no inference can be made from these events that they were based on plaintiff's sex.

5.   Previous complaints by other women and reprimand.

Counsel makes references to alleged complaints against Rentas filed by two women but even assuming these were admissible, the underlying evidence was not made part of the record. Thus, we may not consider this evidence in disposing of the summary judgment before us.

Plaintiff also points to a 1989 memorandum wherein Rentas was reprimanded for participating, along with various co-workers, in what Rentas considered to be a "joke" upon Mrs. Cynthia Aponte.[12] Even assuming this constituted relevant conduct, there is no indication in the memorandum as to the specifics of the incident nor that it was sex-based.

6.   Complaint by Victor Torres.

Plaintiff also submitted information pertaining to a harassment complaint filed by Victor Torres, a co-worker, against Rentas. According to a July 20, 2000 investigation report of the complaint, Rentas' subordinates - both men and women - were unsatisfied with his management style. They considered it both "insensitive" and

---

[12] Plaintiff's Opposition to Defendants' Statement of Uncontested Facts (docket No. 143) Exh. 3.

CIVIL NO. 02-2417 (RLA)                                    Page 42

"unprofessional" and averred it also lead to disrespectful conduct. According to the report, the employees considered "[Rentas'] behavior in the working area is deplorable and inadequate."[13]

Specifically, the employees alleged that Rentas would: (1) make "inappropriate jokes" as well as participated and promoted "horse playing among employees"; (2) "approved payment of overtime to employees without legitimate reason"; (3) make "derogatory comments against several employees" and (4) make "statements like 'I am the boss here and everybody has to do what I say.'"[14]

While these incidents may evince a poor management style, in no way are they probative of sexual harassment in plaintiff's case. Additionally, the supervisor's allegedly egregious conduct was directed at all employees, both men and women.

7.   Rentas' criminal record.

Plaintiff attempts to create issues of fact by making references to Rentas' criminal record. As indicated by defendant, this evidence is inadmissible and may not be considered by the court in support of plaintiff's position.

Thus, even viewing plaintiff's position under the best light possible, the evidence of sex motivation is simply not there. Further, the evidence submitted does not remotely meet the severity

---

[13] Plaintiff's Opposition to Defendants' Statement of Uncontested Facts (docket No. 143) Exh. 21.

[14] *Id.*

and pervasive requirements for a hostile environment claim based on sex discrimination.  The court is mindful that Rentas' management style may be deemed unprofessional and even abusive, but we deem it insufficient for a Title VII hostile environment claim.

### Quid Pro Quo

Title VII also protects from *quid pro quo* sexual harassment. "In this form of harassment, 'an employee or supervisor uses his or her superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliates by taking action adversely affecting the subordinate's employment.'" Valentin-Almeyda, 447 F.3d at 94 (citing O'Rourke, 235 F. 3d at 729).

Even though plaintiff attempts to plead *quid pro quo* harassment by indicating that Rentas admonished her that unless she changed her attitude towards him he would give her a hard time at work and fire her,[15] there is no evidence in the record to  support such a claim. Further, apart from the conclusory nature of the allegations, there is no indication of any kind of request for sexual favors on the part of Rentas nor that any rejection on plaintiff's part affected a tangible aspect of her employment. In essence, all that plaintiff alleges is that Rentas made "comments of a sexual nature and commented on Plaintiff's appearance."[16]

---

[15] *See*, Second Amended Complaint (docket No. 30) ¶ 29(f).

[16] Plaintiff's Opposition to Defendant's Statement of Uncontested Facts (docket No. 143) ¶ 66.

CIVIL NO. 02-2417 (RLA)                                        **Page 44**

Accordingly, we also find that plaintiff failed to establish a *quid pro quo* sexual harassment.

The court having dismissed the Title VII sexual harassment claims, there is no need to discuss the arguments related to the affirmative defense raised by PRTC.

### Retaliation - Title VII

In addition to her hostile environment claim, in her Second Amended Complaint[17] plaintiff alleges that she was subjected to retaliation as a result of having complained of sexual harassment.

Defendant contends, however, that this particular cause of action should be dismissed for failure to exhaust administrative remedies and as time-barred. In the alternative, PRTC argues that there is no merit to this claim.

Similar to the ADA retaliation claim, plaintiff failed to timely exhaust the prerequisite administrative remedies regarding her Title VII retaliation cause of action.

Because ADA incorporated the exhaustion requirements applicable to Title VII discrimination suits, we hereby adopt our reasoning previously stated under the ADA provisions and find that plaintiff's Title VII retaliation claim equally merits dismissal.

### FLSA

Lastly, based essentially on the arguments set forth by PRTC, plaintiff's FLSA claims are hereby **DISMISSED.**

_____

[17]   Second Amended Complaint (docket No. 30) ¶ 56.

CIVIL NO. 02-2417 (RLA)                                      **Page 45**

---

### SUPPLEMENTAL JURISDICTION

The court having dismissed the federal-based causes of action, plaintiffs' remaining state law claims are hereby **DISMISSED WITHOUT PREJUDICE.** *See*, McGee v. Delica Co., Ltd., 417 F.3d 107 (1st Cir. 2005); Gonzalez v. Family Dept., 377 F.3d 81, 89 (1st Cir 2004).

### CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment (docket No. **142**)[18] is **GRANTED.**

Accordingly, plaintiff's claims under the federal statutes, i.e., the ADA, the Rehabilitation Act, Title VII, and the FLSA are hereby **DISMISSED.**

It is further ORDERED that local claims asserted under our supplemental jurisdiction be and the same are hereby **DISMISSED WITHOUT PREJUDICE.**

Judgment shall be entered accordingly.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 10th day of January, 2007.

S/Raymond L. Acosta
RAYMOND L. ACOSTA
United States District Judge

---

[18] *See*, Plaintiff's Opposition (docket No. **143**); defendants' Reply (docket No. **144**) and Sur-reply by plaintiff (docket No. **145**). *See also*, defendant's Motion Submitting Certified Translations (docket No. **173**).